## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:                                    *
JEFFREY J. BACKENSTOES                    *    CHAPTER 13
and KIM M. BACKENSTOES,                   *
      Debtors                          *
                                          *    CASE NO. 1:10-bk-04473MDF
ARTHUR FUNK & SONS, INC.,                 *
      Movant                           *
                                          *
   v.                                   *
                                          *
JEFFREY J. BACKENSTOES                    *
and KIM M. BACKENSTOES,                   *
and                                       *
CUMBERLAND COMMONS, LLC.                  *
formerly Majestic Eagle Holdings, LLC.,   *
      Respondents                      *

## OPINION

Before me are two contested matters related to the treatment of the claim filed by Arthur

Funk & Sons, Inc. ("Funk") in the bankruptcy case of Jeffrey J. Backenstoes and Kim L.

Backenstoes (collectively, the "Debtors"). Funk's secured claim is based on a confessed

judgment entered against the Debtors arising from a loan guarantee they executed on behalf of

Majestic Eagle Holdings, LLC ("Majestic Eagle"). Majestic Eagle later became known as

Cumberland Commons, LLC ("Commons, LLC").[1] The first issue for resolution is Funk's

motion brought under the Pennsylvania Deficiency Judgment Act, ("DJA"), 42 Pa. C.S. 8103, to

fix the fair market value of property located at 602-604 Cumberland Street, Lebanon, Lebanon

---

[1]The record is unclear as to when Commons, LLC became the successor in interest to Majestic Eagle. The court takes judicial notice of its records noting that Commons, LLC filed a Chapter 7 petition on June 24, 2011 at Case No. 1:10-bk-04473-MDF. In the petition, Commons, LLC states that it was formerly known as Majestic Eagle Holdings, LLC doing business as Majestic Eagle Holdings, Inc. ("Majestic, Inc."). In its Statement of Financial Affairs, Commons, LLC states that Majestic, Inc. is its "parent or holding company" and the "single member and owner" and that Debtors own all of the shares of Majestic, Inc.

County, Pennsylvania (the "Cumberland Street Property"). The second issue is the fair market value of Debtors' Lebanon County residence (the "Residence") and of two undeveloped, adjacent tracts on Mountain Road, East Hanover Township, Dauphin County, Pennsylvania ("the Mountain Road Properties"). Jeffrey J. Backenstoes ("Jeffrey") holds an interest in the Mountain Road Properties as a tenant in common with his brother Steven Backenstoes ("Steven"). For the purposes of judicial efficiency, the parties agreed that the values of the Residence and of the Mountain Road Properties would be determined under 11 U.S.C. § 506(a) in the same proceeding to fix the value of the Cumberland Street Property under the DJA. The values of these properties, which Debtors plan to retain, must be determined to resolve Funk's objection to the confirmation of Debtors' Chapter 13 plan and its motion to dismiss Debtors' bankruptcy case.

## I. Procedural History

On May 27, 2010, Debtors filed their Chapter 13 bankruptcy petition. Funk filed an objection to the confirmation of Debtors' plan and a motion to dismiss Debtors' petition on November 3, 2010. Debtors filed an objection to the motion to dismiss on November 30, 2010.

On July 20, 2011, Funk filed a Motion for Order Vacating and Annulling Automatic Stay ("Stay Motion") so that it could pursue a deficiency judgment action in state court against Debtors on their guarantee of the debt Commons, LLC owed to Funk. Later, Funk withdrew the Stay Motion when the parties agreed that Debtors' rights under the DJA would be determined in the claims resolution process before this Court. On September 8, 2011, Funk filed the motion to fix the fair market value of the Cumberland Street Property. Debtors answered the

2

motion on October 13, 2011, and hearings were held on January 18, February 29, and March 21, 2012. Briefs have been filed and the matter is ready for decision.[2]

## II. Factual Findings

### A. The Cumberland Street Property

On December 19, 2007, Debtors, through Majestic Eagle, purchased the Cumberland Street Property for $315,000. When the property was acquired it was in disrepair. Thus, Debtors engaged Funk to perform certain renovations and improvements so that the property could be leased. Specifically, Funk was to construct "shell" office spaces on the first floor, which would be completed according to the specifications of the eventual lessee. On the second floor, Funk was to provide finished apartments for immediate occupancy. In the basement, Funk was to build finished storage spaces ready for leasing. The original contract price for the improvements was $1,345,298, but change orders and other factors produced a revised contract price of $1,394,988. Debtors were required to guarantee the obligations of Majestic Eagle in the amount of $1,452,147.87.

On March 29, 2010, Funk confessed judgment against Debtors on their guarantee in the amount of $1,164,254.39. In or around August 2010, Funk was notified that insurance premiums and electric bills for the property were not being paid and that electrical service had been terminated. With the consent of Debtors and the first lien holder, Sovereign Bank ("Sovereign"), Funk began managing the Cumberland Street Property and collecting rents from tenants in

---

[2]I have jurisdiction pursuant to 28 U.S.C. §§157 and 1334. This matter is core pursuant to 28 U.S.C. §157(b)(2)(A), (B), (K), (L) and (O). This Opinion and Order constitutes findings of fact and conclusions of law made pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.") 7052, which is applicable to contested matters pursuant to Fed. R Bankr. P. 9014.

3

September 2010. At that time, all renovation work under the contract had been completed. When Funk began managing the property, two of the four apartments were rented, two of the thirty storage units were filled, but no commercial space had been leased.

As the de facto manager of the Cumberland Street Property, Funk entered into a ten-year lease agreement with the Lebanon Valley Chamber of Commerce (the "Chamber") in November 2010. The Chamber agreed to lease three of the four commercial spaces on the first floor at a rate of $10.44 per square foot. Funk began preconstruction planning of the build-out after the lease was signed, but no work at the site was commenced until January 2011. The Chamber did not occupy the property until approximately June 2011. Funk spent $23,927 on costs related to the project between September 9, 2010 and January 7, 2011.

On September 21, 2010, Funk filed a complaint for a mechanics' lien against Commons, LLC in the Court of Common Pleas of Lebanon County ("state court") to reduce to judgment the claim that was filed on February 5, 2009. On November 18, 2010, a default judgment on the mechanics' lien claim was entered against Commons, LLC in state court in the amount of $1,394,988 plus interest and costs. On February 3, 2011, Funk assigned its mechanics' lien claim and judgment lien to Lebanon Commerce Center, LP ("Lebanon, LP"), an entity created to acquire and manage the property. On February 8, 2011, Lebanon, LP purchased the Cumberland Street Property at sheriff's sale. By agreement dated February 28, 2011, Lebanon, LP purchased Sovereign's mortgage interest in the property for $285,000.

The Cumberland Street Property consists of a three-level (two stories over a basement) masonry building on a .35-acre corner lot on the main east-west traffic artery in downtown Lebanon. The site has 77 feet of frontage on Cumberland Street, 198 feet of frontage on the

4

intersecting street, and a fifteen-space parking lot. The building was erected about 1900 and contains approximately 13,000 square feet of space on the first and second floors and a total of 18,890 square feet of space when the basement is included. The building is constructed of pre-cast concrete walls with brick and stucco facing. As part of the renovation work, Funk updated the HVAC and electrical systems and installed insulated glass windows. The flat roof was re-covered in rubber and a security system was installed.

The first floor consists of approximately 6204 square feet of space that was a "shell" space on the date of the sheriff's sale. When Funk stopped doing work on the building in December 2008, the first floor had been divided into four units with four bathrooms. The walls were unpainted, the ceiling had not been installed, there were no floor finishes, heating and air conditioning had not been installed, and the exterior walls had no drywall. The second floor consists of approximately 6204 square feet with four finished residential apartments – a single three-bedroom unit and three four-bedroom units. When Funk assumed control of the building in September 2010, two of the apartments had paying tenants. The basement consists of approximately 6114 square feet with approximately thirty climate-controlled self-storage units. When Funk assumed control of the building, two of the storage units were rented.[3]

Funk's appraiser, Nelson Ebersole ("Ebersole"), appraised the Cumberland Street Property as of November 14, 2011. He then performed a retroactive appraisal to the February 8, 2011 sheriff's sale date. He submitted written reports for both appraisals. Ebersole found that the highest and best use for the property was for the first floor to be used as commercial space and

---

[3]Tropical Storm Lee caused serious flooding in the basement of the Cumberland Street Property in September 2011, and multiple sump pumps were installed before the November 2011 appraisal was performed.

5

for the second floor to be used as apartments. However, he determined that the basement storage units should not be used because of access limitations.

When Ebersole valued the Cumberland Street Property as of November 14, 2011, he considered three valuation approaches, attributing forty percent to the comparable sales approach, forty percent to the income approach and twenty percent to the cost approach. Using three comparable sales, Ebersole arrived at an indicated value of $79 per square foot that, when applied to the 13,102 square feet of space in the first and second floors, produced a rounded value of $1,035,058 under the comparable sales approach. For the income approach Ebersole used current rental and lease data, including the storage units in the basement. In this approach he estimated that the net operating income would be $86,113, assuming an 8% vacancy rate for the two above-ground floors and a 35% vacancy rate for the basement. Applying a capitalization rate of 9.24%, Ebersole assigned an indicated property value of $932,000 using the income approach. Using the cost approach, Ebersole determined that the property had an indicated value of $1,090,000. Weighing the values under the three approaches, Ebersole concluded that the Cumberland Street Property's estimated value on November 14, 2011 was $1 million.

Ebersole also performed a retrospective appraisal to the date of the sheriff's sale, which was intended to reflect what a willing buyer in an arms' length transaction would have paid for the property on February 8, 2011. In performing this analysis, Ebersole assumed that the first floor remained a shell space not yet completed for occupancy by future tenants. Ebersole again considered the sales comparison, income, and cost approaches. Although he was aware of remedial measures that had been taken after the building was flooded in September, Ebersole testified that no adjustments were made in the retrospective valuation to reflect the basement's

6

susceptibility to flooding. Using three comparable sales, Ebersole arrived at an indicated value of $48 per square foot that when applied to the 13,102 square feet of space in the first and second floors produced a value of $628,896. For the income approach, Ebersole used the leases that were in place on the relevant date. In this approach he estimated that the net operating income would be $51,867, assuming an 8% vacancy rate for the residential units, a 30% vacancy rate for the commercial space, and a 35% vacancy rate for the basement. Applying a capitalization rate of 9.24%, Ebersole assigned an indicated property value of $561,000 using the income approach. Using the cost approach, Ebersole determined that the property had an indicated value of $774,000. Weighing the values under the three approaches, Ebersole concluded that the estimated value of the Cumberland Street Property was $630,000 on February 8, 2011.

Debtors' appraiser, Jeffrey Ellsworth ("Ellsworth"), appraised the Cumberland Street Property effective November 1, 2011. He did not provide a written report valuing the property as of the February 8, 2011 sheriff's sale, but offered an oral appraisal after hearing the testimony of other witnesses regarding the condition of the building on that date.

Ellsworth determined that the highest and best use for the Cumberland Street Property was for its continued mixed use for commercial and residential purposes. Unlike Ebersole, Ellsworth considered all three floors of the property when he made adjustments for value under the comparable sales approach. In addition to the comparable sales approach, Ellsworth considered the income approach, but he did not develop a cost approach having determined that it was not suitable for an older property. When weighing the sales comparison and the income approaches, 60% of the weight was placed on the sales comparison approach and 40% of the weight was placed on the income approach. In applying the sales comparison approach,

7

Ellsworth considered eleven comparable sales but focused on five sales and ultimately gave the most weight to three sales. He arrived at an indicated value of $69.04 per square foot that when applied to the total space of 18,890 square feet produced a rounded value of $1,304,200 under the comparable sales approach. For the income approach, Ellsworth estimated that the net operating income would be $96,270, assuming a 3% vacancy rate for the two above-ground floors and a 15% vacancy rate for the basement. Applying a capitalization rate of 8.17%, Ellsworth assigned an indicated property value of $1,179,000 using the income approach. Weighing the values under the sales comparison and income approaches, Ellsworth concluded that the Cumberland Street Property's estimated value was $1,254,000 on November 1, 2011.

Ellsworth did not prepare a written retrospective appraisal to the date of the sheriff's sale. He asserted that he was unable to render a retrospective appraisal until he had heard testimony about the condition of the building on February 8, 2011 and had received copies of relevant documents, including architect's drawings and the contract between Funk and Majestic Eagle. Based upon the information presented at trial, Ellsworth concluded that the Cumberland Street Property's estimated value on February 8, 2011 was $950,000 to $1 million.[4]

B. The Residence

The Residence is a four-bedroom, 3.5-bath home on a .77 acre lot in an upscale development outside of the City of Lebanon. The house was built in 2009 and has 3992 square

---

[4]Ellsworth stated explicitly that he did not use the three conventional approaches to valuation for the purpose of rendering his opinion as to the value of the Cumberland Street Property on February 8, 2011.

feet of floor space in ten rooms with a total "living area" of 4585 square feet.[5] It has a finished

basement and a three-car garage, and the exterior is stone and vinyl.

Both parties employed licensed appraisers to establish a value for the Residence.

Debtors' appraiser, Robert Jones ("Jones"), estimated the value to be $528,000 by the sales

comparison approach as of October 24, 2011. Jones looked at nine properties within two miles of

the Residence, all located in the same township. Six of the properties included actual sales and

three were similar properties on the market. Jones based his valuation primarily on three sales

that settled in 2011. Using the identical approach, Ebersole estimated the value to be $590,000

as of January 12, 2011. He looked at three sales of comparable properties in the same school

district as the Residence. When adjusting comparables for square footage, Ebersole used the total

"living area" of 4585 square feet rather than the 3992 square feet of floor space measurement

used by Jones.

### C. The Mountain Road Properties

Jeffrey and Steven own the Mountain Road Properties, which consist of two parcels of

ground, one containing six acres and the other fifteen acres. The brothers acquired the six-acre

parcel in 1996 from their father and the fifteen-acre parcel in 2008 from their mother and father.

The six-acre parcel, which has been owned by the Backenstoes family since the 1940s, is used

for recreational purposes. It has significant slope and is entirely wooded. When Jeffrey and

Steven acquired the fifteen-acre tract in 2008 it included two pole barns, an abandoned

---

[5]Ebersole conducted an appraisal of the Residence which focused on the "living area" instead of floor space. Ebersole testified that "living area" includes square footage in rooms where vaulted ceilings exist instead of upstairs floor space. The additional square footage is calculated by measuring the outside perimeter of the room at the height where the additional floor space would have existed but for the vaulted ceiling.

residence, and several abandoned sawmill buildings. Much of the fifteen-acre parcel is mountainside, with approximately eleven wooded acres. The larger of the two barns on the parcel ("the large barn") contains 7200 square feet of sheltered space, while the other barn ("the small barn") contains 5000 square feet. The large barn was built in 1995 at a cost of $48,000. The small barn was built in 1998 at a cost of $25,000. Both barns were erected from wooden posts or poles sunk vertically into the ground to which metal siding and roofing were attached by wood framing. A concrete pad was poured inside each barn after the buildings were erected. Of all the component parts of the barns, only the concrete pad is definitely immovable. The parties dispute whether the poles are anchored in concrete at the base, which would make their removal and transportation impracticable. Even if the poles are not removable, however, the framework, siding, and roofing could be removed and reattached to new poles at a different location.

The pole barns were placed on the property under an oral lease between John P. Backenstoes, ("John") operating as John P. Backenstoes and Sons ("JPB&S"),[6] and his brother, Lester Backenstoes ("Lester").[7] John and Lester owned the fifteen-acre parcel when the lease arose. The oral agreement provided that in consideration for the use of the land with the pole barns, JPB&S would pay the real estate taxes. JPB&S incorporated in 2001 when Steven became the sole owner of the business, and it continues to use the small barn to store equipment. The large barn is currently leased to a local farmer at a monthly rent of $1200 under a month-to-month lease.

---

[6]John P. Backenstoes is the father of Jeffrey and Steven.

[7]Lester Backenstoes conveyed his interest in the fifteen-acre parcel to John Backenstoes and his wife on March 11, 2008.

Debtors did not retain an appraiser to value the Mountain Road Properties, and the only testimony provided by Debtors was presented by the owners, Jeffrey and Steven. Jeffrey estimated the market value of the six-acre parcel to be equal to its tax assessed value, or $4080, and the value of the fifteen-acre parcel to be $67,500 without the pole barns. Steven estimated the market value of the six-acre parcel to be between $3000 and $3600, and the value of the fifteen-acre parcel to be between $60,000 and $67,500 without the barns.

Ebersole provided an expert opinion on the value of the Mountain Road Properties on behalf of Funk. He opined that the highest and best use of the property was as a 21-acre home site. He valued the land without the buildings at $170,000, or about $8000 an acre. He valued the large barn at $81,820 and the small barn at $54,000. Ebersole concluded that as of June 27, 2011 the total value of both parcels with the pole barns was $305,000.

### III. Discussion

*A. Valuation of the Cumberland Street Property*

Funk's motion to fix the value of the Cumberland Street Property arises under the DJA. The purpose of the DJA is to relieve judgment debtors from personal liability to a creditor for the fair market value of property purchased by the creditor at an execution sale. *Loukas v. Mathias*, 931 A.2d 661, 667 n.7 (Pa. Super. 2007) (citation omitted). A guarantor of a debt may assert rights under the DJA when a creditor seeks to recover from the guarantor. *Confederation Life Insurance Co. v. Morrisville Properties, L.P.*, 715 A.2d 1147 (Pa. Super. 1998). The DJA provides in relevant part as follows:

11

> (a) General rule. – Whenever any real property is sold, directly or indirectly, to the judgment creditor in execution proceedings and the price for which such property has been sold is not sufficient to satisfy the amount of the judgment, interest and costs and the judgment creditor seeks to collect the balance due . . . , the judgment creditor shall petition the court to fix the fair market value of the real property sold.
>
> . . . .
>
> (c) Action on petition –
>
> . . . .
>
> > (2) If an answer is filed controverting the averment in the petition as to the fair market value of the property, but no testimony is produced at the hearing supporting such denial of the fair market value, the court shall determine and fix as the fair market value of the property sold the amount thereof alleged in the petition to be the fair market value.
> >
> > . . . .
> >
> > (4) If an answer is filed and testimony produced setting forth that the fair market value of the property is more than the value stated in the petition, the court shall hear evidence of and determine and fix the fair market value of the property sold.

42 Pa. C.S. § 8103.

Under the DJA, a judgment creditor seeking to fix the fair market value of its collateral and obtain a deficiency judgment against a debtor must petition the court to do so within six months of the execution and delivery of the sheriff's deed. 42 Pa. C.S. §§ 5522(b)(2), 8103(d). *Bryn Mawr Trust Co. v. Healy*, 446 Pa. Super. 501, 506, 667 A.2d 719, 722 (1995). When the bankruptcy petition of a deficiency judgment debtor is pending during the relevant period, the creditor may litigate its DJA petition before the bankruptcy court. *Zinchiak v. CIT (In re Zinchiak)*, 406 F.3d 214, 225 (3d Cir. 2005) (DJA proceedings are within "related to" jurisdiction under 28 U.S.C. §157(a)). The value of the property subject to the judgment is to be determined as of the date of the sheriff's sale. *McCartney v. Integra Nat. Bank North*, 106 F.3d

12

506, 513 n.5 (3d Cir. 1997) (citing *Fidelity Bank, N.A. v. Bourger*, 444 Pa. Super. 52, 663 A.2d 213 (1996)).

In the matter before me, as a judgment lien creditor of Commons, LLC, Funk assigned its rights to Lebanon, LP, which purchased the Cumberland Street Property at the February 8, 2011 sheriff's sale for $6652.73. The amount of Funk's judgment against Debtors, who guaranteed the loan, is $1,164,254.39. Thus, the DJA clearly applies to the sale of the Cumberland Street Property.

As indicated above, Funk's appraiser, Ebersole, valued the Cumberland Street Property at $630,000 on the date of the sheriff's sale. Debtors' appraiser, Ellsworth, estimated that the property was worth between $950,000 to $1 million on the same date. In its brief in this matter, Funk argues that under 42 Pa. C.S. § 8103(c)(2), the value of the property should be set at $300,000, the amount requested in the motion to set the fair market value. Funk argues that Ellsworth's testimony should be excluded entirely for two reasons. First, Funk asserts that because Ellsworth's written opinion addresses the value of the Cumberland Street Property on November 1, 2011 after numerous improvements had been made by Lebanon LP and not as of the February 8, 2011 sheriff's sale, his opinion is irrelevant. Alternatively, Funk argues that the Federal Rules of Civil Procedure prohibit an expert from testifying to matters outside of the scope of his pre-trial expert report. Ellsworth's oral retrospective opinion was not in his pre-trial report; therefore, it should be excluded. Funk argues that if Ellsworth's opinion is excluded, Debtor produced no testimony supporting denial of the fair market value as alleged by Funk in its motion. Thus, pursuant to 42 Pa. C.S. § 8103(c)(2), the value of the Cumberland Street Property would be set at the amount alleged in the motion to fix the fair market value – $300,000.

13

*1. Relevance of November 1, 2011 appraisal*

Fed. R. Evid. 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. With regard to expert testimony, the Federal Rules of Evidence generally require "a trial judge [to] act[] as a gatekeeper to ensure that any and all expert testimony or evidence is . . . relevant. . . ." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008) (citations and internal quotations omitted).

At the hearing in the matter, Funk objected to the relevance of Ellsworth's written opinion because it was based on comparable sales transactions that occurred after the date of the sheriff's sale. I reserved my ruling on the objection and allowed the testimony to proceed. I now conclude that the testimony was relevant. Both appraisers performed appraisals of the Cumberland Street Property as of November 2011. Significant alterations to the property were made between the date of the sheriff's sale and the dates of the appraisals related to the build-out of the space now occupied by the Chamber. Funk offered into evidence Ebersole's November 2011 appraisal, which provided the underpinning for his written retrospective appraisal as of February 8, 2011. Neither November appraisal is conclusive of the value on the date of the sheriff's sale, but both "make the existence of any fact that is of consequence to the determination" of the value of the property on February 8, 2011 "more probable or less probable." Therefore, both Ebersole's and Ellsworth's November 2011 appraisals are relevant.

*2. Admissibility of Ellsworth's opinion of value as of February 8, 2011*

In the alternative, Funk asserts that Ellsworth's oral retrospective valuation opinion as of February 8, 2011 violates Fed. R. Civ. P. 26(a)(2) and should be excluded. Rule 26(a)(2)(A)

requires a party to disclose and identify any expert it intends to call at trial. Rule 26(a)(2)(B) further requires that the disclosure be accompanied by, among other things, a written report prepared and signed by the witness, which contains a complete statement of all opinions to be expressed, the basis and reasons for the opinions, the facts or data considered by the witness in forming the opinions, and any exhibits that will be used to summarize or support the opinions. "A report is deficient if it fails to include any of the underlying conclusions on which the expert's ultimate opinions are based." *Adkins v. County of Orange*, 372 F. Supp. 2d 377, 395 (S.D. N.Y. 2005); *see also Oliner v. Kontrabecki (In re Cent. European Indus. Dev., Co.),* 427 B.R. 149, 156 (Bankr. N.D. Cal. 2009) ("Bald conclusions or brief statements of ultimate conclusions with no explanation of the basis and reasons therefor, or the absence of a statement of how the facts support the conclusions, do not satisfy Rule 26(a)(2)(B) requirements.") "If a party fails to provide information . . . as required by Rule 26(a), the party is not allowed to use that information . . . unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Funk argues that Ellsworth's retrospective oral opinion should be disregarded under Rule 37(c) because it does not meet the requirements of Rule 26(a)(2)(B).

Rule 37 "is designed to provide a strong inducement for disclosure of Rule 26(a) material," but it still leaves the trial court with discretion to determine if a party provides substantial justification for their delay or if the delay is harmless. *Newman v. GHS Osteopathic, Inc.,* 60 F.3d 153, 156 (3d Cir.1995). The purpose of Rule 26(a)(2)(B) is "the elimination of unfair surprise to the opposing party and the conservation of resources." *Reed v. Binder*, 165 F.R.D. 424, 429 (D. N.J. 1996) (citing *Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 284 (8th Cir.1995)), *cert. denied,* 516 U.S. 822 (1995) (other citations omitted). "Failure to

comply with Rule 26 regarding expert witnesses is only harmless when 'there is no prejudice to the party entitled to disclosure.'" *Fitz, Inc. v. Ralph Wilson Plastics Co.*, 184 F.R.D. 532, 536 (D. N.J. 1999) (quoting *Reed,* 165 F.R.D. at 430 (other citations omitted)).

Under Rule 37(c)(1), the decision to exclude an expert report for failure to comply with Rule 26 is within the discretion of the trial court. *Newman v. GHS Osteopathic Inc.,* 60 F.3d 153, 156 (3d Cir.1995) (citation omitted). "Potential sanctions for violation of Fed. R. Civ. P. 26(a)(2)(B) may be severe given that '[n]othing causes greater prejudice than to have to guess how and why an adversarial expert reached his or her conclusion.'" *Fitz*, 184 F.R.D. at 536 (citing *Reed,* 165 F.R.D. at 430). *See also Cornell Capital Partners, L.P. v. Bad Toys, Inc.*, Civil No. 05-5700 (FSH), 2007 WL 4588332, *2 (D. N.J. February 23, 2007) (excluding expert testimony due to insufficiency of report); *Hall v. GMAC Mortg. Corp.*, Civil No. 06-1133 (FSH), 2007 WL 4588259, *2 (D. N.J. February 22, 2007) (same).

In the instant case, there is no dispute that Ellsworth's written report is silent regarding his opinion as to value of the Cumberland Street Property on February 8, 2011. Thus, in order to preserve Ellsworth's testimony for the record and assign it any persuasive weight, it is incumbent upon Debtors to establish that the omission was either "substantially justified" or "harmless" under the language of Rule 37(c)(1). To meet their burden, Debtors allege that Funk made it impossible for Ellsworth to produce a timely written report by refusing to provide him with certain historical information about the property that he had requested.

Debtors' argument is unpersuasive for two reasons. First, Debtors failed to adduce testimony from Ellsworth substantiating this allegation. Ellsworth testified that he possessed information regarding conditions at the property at the time of the sheriff's sale. Specifically, he

testified that he had "plans, specifications [and] architect's certificates" for the property provided to him by Funk and that David Funk ("David") had given him a tour of the building on November 1, 2011 and answered his questions about it. (3/21/12 N.T. 36). Ellsworth did not testify in this proceeding until February 29, 2012. Thus, he had ample time to prepare a retrospective report after Ebersole presented his retrospective report on behalf of Funk on January 18, 2012. Without specific information to identify the documents that Ellsworth needed, but Funk failed to produce, I cannot conclude that Debtors have borne their burden to prove that the failure to prepare and serve a written report on Funk was "substantially justified."[8]

Second, and more significant, the oral opinion of value offered by Ellsworth failed to include any of the underlying conclusions on which his ultimate opinion was based. He specifically stated that his opinion of value as of February 8, 2011 was not based on the sales comparison approach, the cost approach, or the income approach. Although he testified that he arrived at the valuation of between $950,000 and $1 million after reviewing documents in the file and listening to earlier testimony, Ellsworth described no connection between his review of these documents and his opinion as to value. Therefore, I conclude that Ellsworth's retrospective opinion of the value of the Cumberland Street Property should be given no weight in this matter.

### 3. Ebersole's opinion of value

Debtors did not question Ebersole's qualifications to testify as an expert appraiser. Rather, they challenged the reliability of his opinion because it was based on information about the condition of the premises on February 8, 2011 provided by David, who accompanied Ebersole when he viewed the property.

---

[8]Debtors do not argue that admission of Ellsworth's testimony on the issue of retrospective value would be harmless or without prejudice to Funk.

Debtors' objection to Ebersole's opinion highlights the inherent problem with retrospective appraisals. As one bankruptcy court has observed, "[a] retrospective appraisal can present special challenges. Its accuracy may be tainted by the appraiser's knowledge of the market following the effective date of the appraisal. In addition, a retrospective appraisal may be tainted by questions regarding the subject property on the effective date. . . ." *In re Clark*, 07-31044-DHW, 2009 WL 692167, *11 (Bankr. M.D. Ala. Mar. 13, 2009).

It is undisputed that David provided Ebersole with a description of the property as of February 2011when he viewed the property in order to prepare his appraisal. The only testimony about the condition of the property on the date of the sale presented at trial was provided by Robert Funk ("Robert"). But Debtors did not dispute that Funk completed all of the renovations under the contract when it assumed responsibility for managing the property. They agreed that the basement and second floor of the property had been completed. The only question was the status of the first floor. Robert testified that when construction was completed in December 2008, the first floor was a "shell space." He described shell space as having devising walls within the space and bathrooms, but without ceilings, floor finishes, drywall, and mechanicals. Robert distinguished this condition from "vanilla box," which would include drywall, ceilings, and functioning general lighting, mechanical, and electrical systems.

Whether the status of the first floor could be characterized as a "shell" or as a "vanilla box" ultimately is irrelevant. When Ebersole testified, he stated that he considered the two terms to be equivalent and did not distinguish between them to value the property. Therefore, I reject Debtors' objection to Ebersole's opinion on the basis that he relied on information provided by David and Robert Funk.

18

Nonetheless, I do not find Ebersole's report to be unassailable. He was able to identify only three other properties as comparables for the sales comparison approach. Additional comparable sales would have provided a more solid foundation for his conclusions. *See In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, *10 (Bankr. M.D.N.C. March 14, 2005) (appraisal's reliability generally increases with number of true comparables). Only one of the comparables is located in downtown Lebanon, as is the subject. One comparable is located in Annville, Pennsylvania, a much smaller municipality with entirely different demographic influences. Two of the comparables have restaurant space, not office space, on the first floor, and there was no testimony as to how lease rates for restaurant space compare to rates for office space. Further, it was clear that none of the comparables had been recently renovated to the same extent as the Cumberland Street Property. However, considering the unique condition of the Cumberland Street Property on the date of the sheriff's sale, Ebersole's difficulty in identifying comparable sales is understandable.

These aspects of Ebersole's analysis could detract from the general reliability of his opinion, except that his report shows appropriate adjustments to his valuation based on the differences between the subject property and his comparables. For instance, his first comparable was sold in March 2010 for $53.08 per square foot and his third comparable sold in October 2010 for $55.88. Ebersole estimated the value of the Cumberland Street Property to be $2.65 per square foot less than the first comparable and $5.59 less than the third comparable due to the inferior "condition/age" and "quality" of the Cumberland Street Property to those properties. Conversely, he estimated the value of the Cumberland Street Property to be $7.20 greater than the second comparable due to the superior location, condition, and quality of the Cumberland Street Property.

19

As many courts have noted, when valuing real estate, "many variables . . . can influence the determination [and] we deal here in likelihoods and probabilities, not exactitude." *In re Kertennis*, 40 B.R. 895, 897 (Bankr. D. R.I. 1984) (citations and internal quotations omitted). *See also First Am. Bank of Virginia v. Monica Road Assoc. (In re Monica Road Assoc.),* 147 B.R. 385, 390 (Bankr. E.D. Va.1992) (valuation of assets is "not an exact science;" courts "have wide latitude in determining value.") Although appraisals are commonly used to assist a court in establishing value, it is not bound by appraisal values and may form its own opinion as to the value of the subject property after consideration of the appraisers' testimony and their appraisals. *In re Harris*, 97-33412DWS, 1998 WL 318724, *2 (Bankr. E.D. Pa. June 12, 1998). *See The Estate Construction Company v. Miller & Smith Holding Co., Inc.*, 1994 U.S. App. LEXIS 557 (4th Cir. January 13, 1994) (finding the expert's estimate of value to be "somewhat low," court increased value by 50%) *cited in Harris*, 1998 WL 318724, *2; *In re Belmont Realty Corporation,* 113 B.R. 118, 120 (Bankr. D. R.I. 1990) (finding appraisals to be weak, court made an independent determination of value).

Ebersole made a thorough analysis of the Cumberland Street Property and his conclusions are well supported. However, the Court is troubled by his decision not to include the basement space, even at a reduced value, in his analysis. Although he represented that the September 2011 flooding did not influence his opinion, the Court is hard pressed to understand why no value is attributed to this space in the sales comparison report, but some value is assigned in the income approach.[9] Therefore, while the Court concludes that Ebersole's value of

---

[9]Debtors attacked the lease with the Chamber as being below market rate for class A space and referred to the lease as a "sweetheart deal." Although the rental rate of $10.44 per square foot seems low, there was insufficient evidence from which I could determine an appropriate higher rate at which the property could be rented.

20

the Cumberland Street property at $630,000 is justified if the basement level is disregarded, the Court finds that the basement units add value to the property. Therefore, I find that the fair market price of the Cumberland Street Property on February 8, 2011 was $700,000.[10]

B. *Valuation of the Residence and the Mountain Road Properties*

The Residence and the Mountain Road Properties are being retained by Debtors and their values will be determined under the applicable statutory provision, 11 U.S.C. § 506(a)(1). This provision of the Bankruptcy Code provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. *Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.*

11 U.S.C.A. § 506(a)(1) (emphasis added). Courts are divided on the issue of whether the value of real property for the purpose of determining a creditor's interest in property in connection with plan confirmation should be determined as of the date the petition was filed, the date of confirmation, or some other date.[11] Neither party raised the issue of the appropriate valuation

---

[10]In its brief, Funk argues that Robert should have been permitted to offer his opinion as to the value of the Cumberland Street Property either as an expert or as a party in possession of the premises on the valuation date. Although it may have been proper to permit Robert to state his opinion as to the value of the property, the exclusion of his testimony was harmless. The Court gave full consideration to the facts testified to by Robert, particularly in regard to the condition of the property on February 8, 2011. Robert's opinion would have added little to the persuasive testimony of Ebersole, an undisputed expert, on the same issue for which Robert's testimony was offered.

[11]The Court of Appeals for the Third Circuit has not ruled on this issue. In *McDonald v. Master Financial, Inc. (In re McDonald)*, 205 F.3d 606 (3d Cir. 2000), the Court noted in dicta that it was not required in that case to decide what date a court should use when valuing collateral under § 506(a) and that courts were divided on the issue. Although the Court of

date for the Residence and the Mountain Road Properties. Debtors filed their petition on May 27, 2010, the appraisals were performed in 2011, and the hearings on value were held during the first three months of 2012. Although a confirmation hearing has been called, it has been continued numerous times pending the resolution of the within claims. Therefore, the confirmation date of the plan is yet to be determined.

Despite this uncertainty, I find that the confirmation date is the appropriate point to value property under § 506(a)(1) for the purpose of treating secured claims in a Chapter 13 case. Although I have used other approaches in the past, I find the reasoning of Judge Sigmund in *In re King*, No. 01-37214DWS, 2003 WL 22110779 (Bankr. E.D. Pa. Sept. 2, 2003), to be persuasive on this issue. Judge Sigmund adopts the confirmation date as the appropriate date to value collateral under § 506(a) for the purpose of treating claims in a Chapter 13 case for two reasons. She notes that not only is the confirmation date consistent with the reference in the second sentence of § 506(a)(1) to valuation being made "in conjunction" with a hearing on a plan, the latter date also recognizes a creditor's entitlement to adequate protection of its interest during a case. *Id.* at *3. Using the confirmation date as the valuation date recognizes the purpose

---

Appeals acknowledged that the value should be set in light of the purpose of the valuation and in conjunction with the hearing on the plan, the Court also observed that "whatever rule is adopted, it is desirable to avoid allowing an appeal the date used for evaluation. Such a rule could encourage the losing party to bring an appeal in the hope of obtaining a more favorable evaluation." *Id.* at 615. After careful consideration of this admonition, I find that the clear language of § 506(a)(1) supports the use of the date of the confirmation hearing as the date for valuing the interest of a secured claim in real property in conjunction with an objection to a Chapter 13 plan. I note that by statute the valuation date for personal property is different. Section 506(a)(2), added to the Code in 2005, directs that personal property in a Chapter 7 or 13 case is valued as of the date of the petition. *See* 11 U.S.C. § 506(a)(2).

for the valuation and also acknowledges a secured creditor's entitlement to adequate protection during the pendency of a case. One bankruptcy court adopting the confirmation date as the valuation date also has observed that the value to be distributed to a secured creditor is to be determined under § 1325(a)(5)(B)(ii) as of the "effective date of the plan."[12] This provision supports a finding that the date of the confirmation hearing is the appropriate valuation date. *Roach v. Bank of Missouri* (*In re Roach*), Bank. No. 08-20667-DRD-13, 2010 WL 234959, *3 (Bankr. W.D. Mo. January 15, 2010).

### 1. *Valuation of the Residence*

Having addressed the issue of the appropriate time for establishing the value of property in the context of plan confirmation, I will review the evidence regarding the value of the Residence. Debtors built their home in 2009 at a cost of $693,000. Funk's appraiser, Ebersole, valued the Residence at $590,000 as of January 12, 2011. Debtors' appraiser, Jones, valued it at $528,000 as of October 24, 2011. Each appraisal has its faults and merits.

Jones' appraisal was conducted ten months closer to the hearings held in connection with the confirmation of Debtors' plan. Jones considered both the cost approach and the sales comparison approach, but relied on the sales comparison approach. For comparable sales, Jones used nine properties, six of which were sales and three of which were similar listings. All comparable properties were located within two miles of the Residence. Jones stated that three sales were within one-half mile of the subject property and were "very comparable to it." (N.T. Jan. 18, 2012 p. 26). From these three sales he determined that the value of the Residence was

---

[12]The "effective date of the plan" is not defined in the Bankruptcy Code. A plan becomes "effective" once it has been confirmed and the 14-day appeal period has expired. Therefore, for the purposes of this ruling, the date of confirmation and the "effective date of the plan" are used interchangeably.

23

$528,000. However, his calculations included extensive adjustments due to significant differences between the properties, thus calling into question the degree to which the properties were truly "comparable."

By comparison, Ebersole's appraisal made few adjustments. He examined five properties, three of which were sales and two of which were listings. However, one of the comparable sales was located in a different municipality and was situated in a golf course community. Ebersole's opinion of value was heavily influenced by the golf course property, perhaps inflating the value of the Residence. Also, Ebersole used "living area" square footage when comparing the Residence to other properties, but did not know whether the square footage of these properties was computed in the same manner. The use of the "living space" computation also may have inflated the appraised value of the Residence.

Nonetheless, I find both appraisals to be thorough and generally well-founded; each had its strengths and weaknesses. Therefore, I conclude that the value of the Residence is between the two appraisals and determine the value to be $550,000.

### 2.. *The Mountain Road Properties*

For several reasons, setting a value for the Mountain Road Properties is more complex than setting a value for the Residence. First, like any undeveloped rural acreage, the uniqueness of the Mountain Road Properties makes it more difficult to find recent sales of truly "comparable" properties. Second, the six-acre parcel is entirely wooded and undeveloped, and the cost approach is inapplicable to unimproved property. Third, the parties dispute whether or not the improvements to the fifteen-acre parcel – the two pole barns – are part of the real estate. This issue will be addressed first.

24

Debtors contend that the pole barns are personal property and belong to JPB&S, which built them. Jeffrey testified that JPB&S entered into a lease agreement with Lester and John, the original owners of the fifteen-acre tract. In exchange for JPB&S's promise to pay the real estate taxes on the land, the company was permitted to build and use the pole barns. JPB&S paid the taxes each year after the barns were erected until 2008 when Blue Mountain Holdings ("BMH") was formed by Debtors and Steven and his wife to collect the rents and pay the taxes. BMH continues to pay the real estate taxes on the Mountain Road Properties.

The deed by which Jeffrey acquired his one-half interest in the Mountain Road Properties is subject to the following Pennsylvania statute.

> All deeds or instruments in writing for conveying or releasing land hereafter executed, granting or conveying lands, unless an exception or reservation be made therein, shall be construed to include all the estate, right, title, interest, property, claim, and demand whatsoever, of the grantor or grantors, in law, equity, or otherwise howsoever, of, in, and to the same, and every part thereof, together with all and singular the improvements, ways, waters, watercourses, rights, liberties, privileges, hereditaments, and appurtenances whatsoever thereto belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof.

21 P.S. § 3.

This statute "requires that any conveyance of real property necessarily includes the conveyance of appurtenances" such as garages or other out-buildings that are located on the property. *Baylor v. Soska*, 540 Pa. 435, 437, 658 A.2d 743, 744 (1995). Funk argues that when the Mountain Road Properties were transferred to Jeffrey and Steven, the pole barns were conveyed with the real estate. Debtors contend that the barns are owned by JPB&S, and as personal property, were not transferred with the land.

25

Personal property affixed to real estate such that either the real estate or the personal property will be materially damaged if the personal property is removed is regarded as part of the real property. But if personal property may be removed without destroying or materially injuring either the personal property or the real estate, the intention of the parties when the personal property was affixed to the real estate determines whether it remains part of the real estate. *In re Glenn*, 470 B.R. 731, 737 (Bankr. M.D. Pa. 2012) (citing *Clayton v. Lienhard*, 312 Pa. 433, 436-437, 167 A. 321, 322 (1933)). *See also Slone v. Integra Bank (In re Int'l Bldg. Components)*, 159 B.R. 173, 178-79 (Bankr. W.D. Pa. 1993) (holding that parties intended for 15,000 lb. floor joist system bolted to factory floor to remain personal property).

In 2005, the Commonwealth Court held that a cellular communications tower bolted to a concrete pad was part of the real property. *Shenandoah Mobile Co. v. Dauphin County Bd. Of Assessment Appeals*, 869 A.2d 562 (Pa. Comwlth. 2005). In reaching this conclusion, three factors were examined: how the personal property was attached to the real estate; whether the personal property was essential to the use of the building; and the intention of the parties. *Id.* at 567 (citation omitted). As to the first factor, the Commonwealth Court suggested that if an item is cemented, bolted, or welded to the land, it is more likely to be regarded as part of the real property, even if the item can be removed without damaging the personal property or the real estate. The cellular tower was bolted to a concrete pad, and the pad had no function other than to support the tower. "'Just because they have been and can be moved does not mean the intention was not to make them permanent.'" *Id.* at 568 (quoting *Appeal of Sheetz, Inc.*, 657 A.2d 1011, 1014 (Pa. Cmwlth. 1995)). The court concluded that the tower was part of the real estate. As to the third factor, the Commonwealth Court noted that the intention of the parties is determined by

26

their conduct and not by recitations in a contract. Shenandoah leased the property from the land owner under a five-year lease, but the lease was automatically renewed for up to twenty-five years. Further, the Commonwealth Court found that there was no reason to believe that the tower would be removed unless Shenandoah's business demanded it. Therefore, the Commonwealth Court determined that the trial court did not err when it found that the cell tower was part of the real estate. *Id*.

In the within case, the pole barns were constructed by attaching metal siding and roofing to wooden poles sunk in the ground. Each barn has a concrete pad that was poured after the buildings were erected. The wooden poles that support the building were placed in the ground, but the evidence presented was unclear as to whether the poles had been anchored in concrete.[13] JPB&S owned the barns when they were erected on the land owned by Lester and John. However, when the property was transferred to Jeffrey and Steven in 2008, the pole barns were not excluded from the transfer. Although Jeffrey testified that he regarded the pole barns as belonging to JPB&S, the evidence suggests that the pole barns were built for use by the sawmill operation conducted by JPB&S, and it was intended that they remain on the site until they were no longer useful. Having failed to exclude the pole barns from the transfer of the real estate in 2008, I find that they became part of the real property and, thus, are owned by Jeffrey and Steven.

As indicated above, Ebersole appraised the two parcels at a combined value of $305,000 as of June 27, 2011. While Debtors did not retain an appraiser for the Mountain Road

---

[13]Ebersole testified that the buildings would not have stood during inclement weather if the poles had not been anchored in the ground.

Properties, Jeffrey estimated the combined market value of the two parcels to be $71,580 and Steven estimated it to be between $63,000 and $71,500.[14]

While the testimony offered by Jeffrey and Steven was admissible under the Federal Rules of Evidence, neither of them offered any factual basis to support their estimates. Thus, they are entitled to little weight. Ebersole, by contrast, performed a professional appraisal using the market data approach and substantiated his opinion with reasonably comparable sales of other similar properties. Debtors' brief identifies no glaring errors in the report that would cause the Court to discount Ebersole's valuation. Ebersole substantiated his opinion by proposing that the highest and best use of the two parcels would be as a single residential lot. His comparable properties were land sales that he adjusted by adding in the value of the two buildings. When asked to value the land alone, Ebersole assigned a value of $170,000 to the land without the

---

[14]Funk objected to the testimony of Jeffrey and Steven regarding the value of the property on the grounds that neither of them was qualified as an expert to render an opinion. Funk continues to assert this argument in its brief. However, under Fed.R.Evid. 701, an opinion of a lay witness is admissible if the opinion is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of [expert testimony]." Fed. R. Evid. 701. "If the requirements of Rule 701 are met, then the general rule is that an owner of real property may give his or her opinion as to its value without having to qualify the owner as an expert." *In re Deep River Warehouse, Inc.*, No. 04-52749, 2005 WL 1287987, *10 n.7 (Bankr. M.D.N.C. March 14, 2005) (citing *Hidden Oaks v. City of Austin,* 138 F.3d 1036, 1051 (5th Cir. 1998) ("[W]e adhere to the general rule that an owner [of real property] always may testify as to value, whether assessed as of the time of trial, or at some definitive point in the past."); *In re Petrella,* 230 B.R. 829, 834 n.5 (Bankr. N.D. Ohio 1999) ("[A]n owner is competent to give his opinion as to the value of his property, often by stating the conclusion without stating a reason.").

Case 1:10-bk-04473-MDF    Doc 181    Filed 10/08/12    Entered 10/09/12 14:17:54    Desc
Main Document    Page 28 of 30

buildings, but valued it at $305,000 with the pole barns. The Court questions whether buyers seeking a 21-acre residential lot would find two pole barns to be an asset or a liability. Therefore, it is appropriate to make a downward adjustment to Ebersole's opinion as to value considering that the value of the land was premised on its use as a residential lot. I find that the value of the Mountain Road Properties is $200,000.

## IV.  Conclusion

Under the provisions of the DJA, the value of the Cumberland Street Property is fixed at $700,000. This finding, however, does not determine the amount of Funk's claim.  Under the DJA, Debtors are released on their liability to Funk to the extent of the fair market price of the property less the amount of prior liens, costs, taxes, and municipal claims not discharged by the sheriff's sale or paid at distribution on the sale. 42 Pa. C.S. § 8103(c)(5). Although the amount of Sovereign's first lien on the Cumberland Street Property is in evidence, all possible costs are not addressed  in the record. Therefore, Funk will be directed to file an amended proof of claim within twenty-one days of the date of this Order recognizing the credit against its claim of $700,000 as reduced by the amount of prior liens, costs, taxes, and municipal claims incurred up to the date of the sheriff's sale.

For purposes of resolving Funk's objections to Debtors' Chapter 13 plan and its motion to dismiss Debtors' bankruptcy case, the value of the Mountain Road Properties under 11 U.S.C. § 506(a)(1) is determined to be $200,000, and the value of the Residence under § 506(a)(1) is determined to be $550,000.

Case 1:10-bk-04473-MDF    Doc 181    Filed 10/08/12    Entered 10/09/12 14:17:54    Desc
Main Document      Page 29 of 30

An appropriate order will be entered.

**By the Court,**

Mary D France
Chief Bankruptcy Judge

Date:  October 8, 2012